36 C.C.P.A.(Patents)

## Application of LLOYD.
### Patent Appeals No. 5454.

United States Court of Customs
and Patent Appeals.
Feb. 1, 1949.

Lester F. Dittenhoefer, of New York City, for appellant.

W. W. Cochran, of Washington, D. C. (J. Schimmel, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Chief Judge, and HATFIELD, JACKSON, O'CONNELL, and JOHNSON, Judges.

GARRETT, Chief Judge.

We have here an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the rejection by the Primary Examiner of seven claims, being all the claims, of appellant's application for patent entitled "For Heat-Insulating Material." The claims are numbered respectively 4, 5, 14, 15, 16, 17, and 18.

In the brief for appellant it is stated:

"The problem that confronted appellant was to provide an integral insulation material having, among others, the following physical characteristics:

"(1) An insulation temperature range up to and in excess of 1000° F.

"(2) Light weight and low density.

"(3) Low thermal conductivity.

"(4) A high modulus of rupture.

"(5) Low percentage of volume shrinkage when heated.

"(6) Resistance to compression and abrasion.

"(7) A low percentage of moisture absorption by volume.

"(8) Capability of withstanding a soaking heat of 1250° F.

"(9) Unaffected by immersion in water.

"These characteristics of the material are set forth in appellant's specification."

The brief of the Solicitor for the Patent Office gives the following epitome of the subject matter:

"Appellant's specification describes an alleged new molded, porous, calcareo-silicious material for thermal insulation. In preparing such material, a slurry in water of comminuted calcium oxide (lime), silica, uncalcined bentonite and asbestos fiber is prepared, the bentonite and asbestos components amounting to not over 15% each of the total dry weight of the finished product. The mixture is heated below the boil-

ing point of water until a jelly-like or viscous consistency results, and then placed into molds or forms of the desired shape. The mixture is then thermo-set in its molded shape by subjecting to heat alone or to both heat and steam, and then finally dried. The finished product is said to comprise principally calcium silicate, formed by reaction of the calcium oxide and silica, with minor proportions of asbestos and bentonite, and to possess a very low density, low thermal conductivity, low shrinkage on heating, high tensile strength, and resistant to compression, abrasion and water. The product is alleged to be a superior, low cost, light weight insulation having a wide temperature range and having the requisite structural strength to withstand rough treatment in transportation, application and use."

The board regarded claim 4 as representative. We quote it and, for reasons hereinafter appearing, quote also claims 14 and 17.

"4. A heat-insulating material comprising a shaped and hardened body of cellular structure consisting of calcium silicates reenforced with inorganic fibres, and containing a hydrophilic colloid in an amount not in excess of about fifteen percent of the total dry weight of the material.

"14. A molded insulating material of cellular structure, comprising calcium silicate, bentonite, and asbestos fibres, said material having the following characteristics and properties; weight about twelve pounds per cubic foot; thermal conductivity of not more than 0.50 B.T.U. per hour per degree of Fahrenheit inter-face temperature difference per unit of thickness, at a hot plate temperature of about 220° F.; effective insulating temperature range up to about 1000° F.; tensile strength of not less than fifty to sixty pounds per square inch; and of being unaffected by water.

"17. A light-weight molded cellular heat-insulating material comprising a mixture of about 4 parts by weight of calcium oxide, about 6½ parts by weight of silica, and about 2¼ parts by weight each of bentonite and asbestos fibres."

The references relied upon by both the examiner and the board are the following

patents: Kern, 1,666,936, Apr. 24, 1928; Huttemann et al., 1,932,971, Oct. 31, 1933.

The Kern patent "relates to manufacturing bricks, tiles and other elements useful in the manufacture of houses and buildings, such products being of the general nature of sand lime bricks, but being substantially improved in regard to their properties, * * *." The specification describes the process of manufacturing the articles by mixing "highly pure" sand with slaked lime and supplying water in sufficient amount to enable the molding of the brick, there being added to the mixture kieselguhr, which is a species of diatomaceous earth, and a clay such as bentonite. It is taught that such added materials produce lime bricks that are much stronger than those not having such added ingredients. It is also taught by Kern that both the kieselguhr and bentonite promote silicification and that porosity occasioned by the admixture of the kieselguhr causes acceleration of the hardening of the bricks, which are first heated in a steam atmosphere to produce calcium silicate which acts as a binder.

The Huttemann patent relates "to building material and particularly to heat-insulating light weight blocks with a good mechanical strength."

The board points out that his patent discloses:

" * * * a light weight molded cellular heat-insulating material in the form of calcium silicates reinforced with asbestos fibers. The materials employed by Huttemann et al in making their material are the same as those employed by the appellant here with the sole exception that the patentees do not use bentonite. As disclosed in the patent specification, sand and lime are mixed together in proper proportions with water to form a silicate in which there is no uncombined lime. This material is stabilized with asbestos fiber to increase the mechanical strength of the final product. After thoroughly drying, all but the chemically combined water is driven out, leaving a porous structure which has high heat-insulating weight, that is, of the order of 10 to 60 pounds per cubic foot."

The board stated that neither of the references directly anticipates the claims

here involved, but pointed out that "both show essential and important elements of appellant's composition in combination," and commented:

"In view of the disclosures in these two patents we are in agreement with the Examiner's conclusion that invention would not be involved in improving Huttemann et al's composition by following the teaching of Kern who shows that the addition of bentonite to calcium silicates to provide a porous structure is not new with the appellant. We consider that the products produced by both patentees are sufficiently similar so that it would be obvious to modify either one in view of the other, that is to say, by adding the bentonite of Kern to the composition of Huttemann et al or, for that matter to add asbestos fibers to the Kern composition for the obvious purpose of increasing the mechanical strength thereof would be an entirely obvious procedure."

The board's discussion of claims 14, 16, and 17 is hereinafter quoted.

The brief on behalf of appellant seemingly regards the concession of the board hereinabove noted as being of much importance in the case, saying:

"The decision of the Board states * * * that: *'Neither of these references directly anticipates the claims* but both show essential and important elements of appellant's composition in combination.' Therefore, the issue is primarily that of invention." (Italics quoted.)

Appellant concedes that all elements of his combination are old, but insists that it does not follow from this that invention is lacking. His brief says:

"Both the Huttemann and the Kern patents relate to methods of making building materials. Neither of them relate specifically to a high-temperature insulation, nor do either show all of the elements of appellant's insulation in combination."

We may remark at this point that there is no contention that appellant's art is not analogous to the art of the references.

The brief of the Solicitor for the Patent Office before us maintains that both the examiner and the board erred in a certain particular, which, however, does not affect the conclusion. In the early part of his brief it is said (page references omitted as indicated by asterisks):

"At the outset it is desired to point out that, though both the examiner and Board of Appeals, treated the appealed claims as a group, apparently on the assumption that all the claims stand or fall together, and the decision of the Board states that neither of the references directly anticipates the claims, * * * the actual situation is markedly different. As considered below all the claims have been treated as though they specifically included bentonite in the composition—appellant in his brief * * * falls into the same error. Actually, claims 4 and 16, on the one hand, call broadly for a 'hydrophilic colloid,' while claims 5, 14, 15, 16 [17] and 18, on the other hand, specify 'bentonite.' "

Subsequently, in the brief the solicitor discusses the distinctions among the claims, saying, inter alia, in connection with the discussion of claim 4, that it is believed that the Huttemann et al. patent reference "is in fact better than the Board considered it," for the reason that "each and every limitation thereof has been shown [the brief reads the claim upon the Huttemann et al. disclosure] to be readable upon the patent." It is urged, therefore, that the concession by the board that neither of the references directly anticipates the involved claims, hereinbefore referred to, "should be of no benefit to appellant," citing In re Osse, 120 F.2d 1022, 28 C.C. P.A., Patents, 1267; In re Lewenstein, 165 F.2d 458, 35 C.C.P.A., Patents, 825.

From a careful study of the case in the light of appellant's arguments we fail to find any element in his claim 4, supra, which is not present in the Huttemann patent, except that his patent makes no specific mention of bentonite.

Claim 5 differs from claim 4, supra, in just two particulars; viz., instead of "inorganic fibres" it names "asbestos fibres," and instead of "hydrophilic colloid" it names "bentonite." Huttemann recites in his specification:

"The slurry hereinbefore described **may** be further stabilized and the **mechanical**

strength of the final product may be increased by the inclusion of a small amount of fibrous material, such as asbestos fibers, the amount being on the order of several per cent."

So far as the bentonite is concerned, it might be questioned whether its substitution for some of the several materials named in the Huttemann patent, said to "possess the ability to combine with hydrated lime when subjected to heat," would be invention, but the tribunals of the Patent Office made no specific holding to that effect, and whatever may be the legal situation in that regard, it is immaterial here, because the patent to Kern expressly names bentonite as one of several forms of hydrated aluminum silicates, which when used "have the effect of further promoting the silification of the lime."

Claim 14 is broader than claim 5 in that it places no limitation upon the amount of bentonite to be used. It will be observed that it names specifically just three ingredients, to wit: calcium silicate, bentonite, and asbestos fibres, for producing the molded insulating material of cellular structure, and that it recites certain characteristics of the molded material, such as weight, thermal conductivity, insulating temperature, tensile strength, and "of being unaffected by water."

It was the view of the board that the characteristics or properties of appellant's finished product as expressed in claim 14 would be inherent in the Huttemann et al. composition when modified by the teaching of Kern relative to the use of bentonite. In so holding, the board seems to have gone somewhat further than the examiner.

Concerning claim 14 the examiner, in his statement following the appeal to the board, said:

"Claim 14 recites the product as having a certain thermal conductivity. While this would be inherent in Huttemann's composition as modified by the teaching of Kern, it is not thought that the recitation of a functional property of known desirability may be relied on for patentability."

It will be noted that the only characteristic named in the claim specifically mentioned by the examiner was "thermal conductivity." The board, however, included all the named characteristics (seemingly proceeding upon the theory that the examiner had done so), and held "that the various physical properties of the material as defined in claim 14 would be inherent in the Huttemann et al composition as modified by the teaching of Kern * * *."

■ We do not find in the decision of the board any reference to the functional nature of the characteristics named in the claims, but it is clear that the examiner considered this during the prosecution of the case and gave it as a reason for rejection. Under the long-established practice, the board not having overruled the examiner upon this point, we treat the latter's finding as having been affirmed, In re Boyce, 144 F.2d 896, 32 C.C.P.A., Patents, 718.

Appellant's reasons of appeal cover this point, and it is quite earnestly argued on his behalf before us, not only that the physical characteristics of the molded insulating material defined in claim 14 would not be inherent in the composition of Huttemann when modified by the use of bentonite, as taught by Kern, but also that claim 14 is not functional.

■ We have carefully considered the arguments so made, but we are not convinced of their soundness. The claim defines a material comprised of the three ingredients; viz., calcium silicate, bentonite, and asbestos fibres. It does not even mention the use of water as an ingredient in making the finished product, although it does say that such product is unaffected by water. The several properties of weight, thermal conductivity, etc., specified in the claims are not limitations present in the ingredients—calcium silicate, bentonite, or asbestos fibres—but are results or functions which are present in the completed composition. They are not, therefore, limitations which enter into the patentability of the claims, and to allow the claims upon their bases would be in conflict with the rule clearly stated by the Supreme Court of the United States in the case of United Carbon Co. et al. v. Binney & Smith Co.,

317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232, wherein there are pertinent citations of other cases, and by this court in the case of In re Fullam et al., 161 F.2d 247, 34 C.C. P.A., Patents, 1018, see also decisions therein cited.

Claim 15 was not specifically discussed by either the examiner or the board. It defines the ingredients of a "thermoset, porous, molded body" of heat-insulating material as being composed of lime, asbestos fibres, and bentonite, thus virtually duplicating claims 5 and 14 as to the ingredients used. The claim concludes with the statement, "the bentonite being rendered substantially inert to absorbtion of water by reaction of at least a portion thereof with the lime." This statement obviously is purely functional and under the last authorities cited, supra, adds nothing to the patentability of the claim.

Claims 16 and 17 differ only in the fact that claim 16 like claim 4, supra, calls for the use of a "hydrophilic colloid" and "inorganic fibres," while claim 17, supra, like claim 5, specifies "bentonite" and "asbestos fibres."

Both claims recite the same proportions of the ingredients. See claim 17, supra. The examiner held that such proportions "obviously vary but little from Huttemann's proportions and produce results which vary at most only in degree therefrom." The board's comment reads:

"With regard to the question of proportions as defined in claims 16 and 17 these vary but little from Huttemann et al's proportions, as the Examiner points out, and differs, if at all, as a matter of degree and not as a difference in kind."

Appellant contends that his proportions vary widely from the proportions defined in the prior art and insists the difference is one of kind rather than degree. We quote the following from his brief:

" * * * the patentees [referring here to Huttemann et al.] describe use of 15 to 55 parts lime and 45 to 85 parts silica. In the one case, considering that the total solids are 100 parts, the relationship of lime to silica is 15:85, or 1 part lime to

5.666 parts silica. In the other the relationship is 55:45, or 1 part lime to 0.818 parts silica. Appellant's claims call for 4 parts calcium oxide (lime) and 6½ parts silica, or 1 part lime to 1.625 parts silica. It is evident, therefore, that the Board's holding that the proportions defined in claims 16 and 17 'vary but little from Huttemann, et al.'s proportions' is not well founded in fact, particularly when it is borne in mind that Huttemann makes no disclosure whatsoever of use of bentonite or like hydrophilic colloid. Certainly, Huttemann's statement that 'several per cent' of asbestos [fibres] may be added does not anticipate appellant's clear and definite disclosure of use of 2¼ parts of asbestos fibers.

"The specific rejection of claims 16 and 17, both by the Board and the Examiner, is based on Huttemann alone, although in the blanket rejection of all of the claims Kern is also included.

"The solid ingredients stated by Kern in the example given on page 1, lines 80–85, of his patent are as follows:

Sand .............100 parts by weight
Kieselguhr ........ 3 parts by weight
Slaked lime ........ 8 parts by weight

"Those proportions, which are also recited in claim 2 of the patent, differ so widely from appellant's proportions as not to require further discussion.

"At page 2, lines 79–82, Kern says:

" 'If clay or other aluminum silicates are to be employed, the proportions thereof can likewise vary a good deal, say from 10% up to about 25%.'

"Apparently that statement is relied upon as showing that Kern uses '10–25% of bentonite.' However, as the total parts by weight of the solid ingredients is 111, if bentonite were used in the stated percentages the amount of that substance added would be from 11.1 to 27.75 parts by weight. That is far in excess, and very different from, appellant's use of bentonite in an amount of 2¼ parts by weight.

"We have already shown that appellant's proportions of lime and silica are mate-

588

rially different from those of the Huttemann reference, and since the latter uses no bentonite, it is submitted that the difference is one of kind rather than degree."

It is pointed out in the brief of the Solicitor for the Patent Office that in reaching the conclusion that his proportions vary from those of the prior art, appellant's calculations utilize only the extremes disclosed in the patent, and "It is submitted that values intermediate the extremes disclosed for the silica and lime are clearly as much a part of the teaching of the reference disclosure as those specifically set forth." It is further pointed out that appellant's proportions of silica and lime fall within the range of the reference and that no new unexpected or unobvious result has been shown to flow from the proportions named in the claims, and upon the authority of this court's decision in Re Lothrop, 58 F.2d 429, 19 C.C.P.A., Patents, 1183, it is urged that invention is not present.

It is further pointed out that there does not appear to be anything critical about the proportion of asbestos fibres named in claim 17.

We are not convinced that the conclusion reached by the tribunals of the Patent Office relative to claims 16 and 17 was erroneous.

Claim 18 was included with those rejected upon Huttemann et al. in view of Kern. It was specifically referred to in the examiner's short statement as being so rejected. The board made no specific reference to it. The brief for appellant only says of it that it differs from claim 5 in that it does not include asbestos fibres.

There is no contention that this omission adds to the patentability of the claim, and we think it obvious that it does not do so.

Although both the examiner and the board appear to have erred in this case by treating all the claims as if they specifically included bentonite, we are not convinced that the conclusion reached was erroneous. In consequence decision is affirmed as to the conclusion.

Affirmed.